Affirmed and Opinion Filed September 12, 2016



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-00678-CV

### IN THE MATTER OF R.D.G., JR., A JUVENILE

**On Appeal from the County Court At Law
Kaufman County, Texas
Trial Court Cause No. 16J-009**

## MEMORANDUM OPINION

Before Justices Francis, Fillmore, and Schenck
Opinion by Justice Francis

This is an accelerated appeal from the juvenile court's order waiving jurisdiction and transferring R.D.G., Jr.'s case to criminal district court. In two issues, appellant asserts he was improperly certified to stand trial as an adult because (1) there is no probable cause to show he committed the offense and (2) the evidence is insufficient to establish the statutory factors necessary to support a transfer. For the reasons set out below, we overrule both issues and affirm.

Appellant, who was fifteen years old at the time of the offense, was charged with the delinquent conduct of capital murder. The State filed a petition asking the juvenile court to waive jurisdiction and transfer the case to criminal district court. On the State's motion, the trial court ordered a psychological examination of appellant and ordered the probation department to prepare an investigation of appellant and the circumstances of the offense, a diagnostic study and social evaluation. Once the reports were completed, the trial court conducted an evidentiary

hearing. The State and defense each called three witnesses to testify. The evidence showed that the Kaufman County Sheriff's Office responded to a call at a house in Forney at 11:30 a.m. on November 28, 2015. On arrival, a deputy found the homeowner lying face down in the doorway. He had been shot in the neck and had no pulse. The front door was wide open and the doorframe smashed as if kicked or forced open. The scene was consistent with a home invasion burglary.

Kaufman County Sheriff's Deputy Forest Frierson was the lead investigator on the case. Frierson said a neighbor reported seeing a black car with a broken back passenger window parked in front of the residence that morning. Frierson obtained a license plate number for the car from surveillance recordings installed in a nearby new construction site. The car had been reported stolen nine days earlier and recovered by Dallas police the day after the offense. The FBI searched the vehicle and recovered potential DNA evidence as well as .38-caliber and .22-caliber rounds.

Investigators passed out Crime Stoppers fliers in the area where the car was found. A tipster came forward identifying appellant, Jarvis "Big Bro" Kimbel, Henry Davis, and Deion Young as persons involved in the crime. The tipster said appellant told him he was sleeping in the car and "woke up in the middle of everything happening" and saw a "puddle of blood."

Based on the tip, law enforcement officers spoke to appellant and the three men. Davis, appellant's cousin, told the officers he "rented" the car and picked up appellant, who then drove and to pick up Young and Kimbel. According to Davis, Kimbel wanted to go "hit a lick," or "commit a theft or a burglary." Although Davis said no one else wanted to "hit a lick," Kimbel drove from Dallas to a Buc-ees store in Terrell and then to the house in Forney. Frierson also talked to Young, who said appellant was in the car at the time of the murder and was not asleep.

Frierson and another deputy interviewed appellant at the middle school where he was a student. Appellant initially denied any knowledge of the crime but later told deputies he was

–2–

sleeping in the car when it happened. He also said Kimbel had a .38 Special. Four days later, law enforcement talked to appellant again. This time, appellant said he was in the car with the other three men, went to sleep and woke up when they stopped at a Buc-ees store in Terrell. Appellant said he went inside to get a sandwich, returned to the car, and went back to sleep. He woke up right before being dropped off, and Kimbel told him he would " be okay."

After talking to appellant, Frierson went to Buc-ees and viewed a surveillance video, which showed Davis and appellant entering the store about fifteen minutes before the murder, appellant buying a sandwich, and Davis at the checkout counter. The two returned to the car seen in the construction site video. Frierson said although the view of the car on the Buc-ees video was partially obscured by a truck, he believed appellant got in the car on the driver's side and was driving when the group left Buc-ees for the Forney residence. He said fifteen minutes would have been enough time to drive to the location. After viewing the video, Frierson arrested appellant. At the time of his arrest, appellant had marijuana in his pocket.

Frierson acknowledged no evidence shows appellant had a "leadership role" in the offense, exited the vehicle at the scene, or knew anyone was likely to be harmed. He agreed it appeared to be "nothing more than a burglary plot" and that the suspects believed no one was home. And while he testified appellant knew Kimbel had a gun, he did not know whether appellant had that knowledge before the incident. But, Frierson said appellant was in the car when Kimbel suggested they go "hit a lick."

After his arrest, appellant was placed in the Hunt County Juvenile Detention Center. Janet Moss, the detention supervisor, testified at length to appellant's conduct while there. In one incident, appellant attacked a much smaller 12-year-old boy and had to be restrained. Two weeks later, appellant broke his own hand by punching the wall of his room and told Moss he had to "get his anger out." The next week, detention officers believed appellant and other

inmates were discussing a plan to escape from the facility and told appellant to move to another chair. Appellant refused, became aggressive with the staff, and had to be shackled to get him under control. Appellant told staff members they were "weak ass people."

Shortly after that incident, a detention officer found a piece of paper on appellant outlining an escape strategy with different inmates' names and specific assignments. The plan was to get to the control room, release all the inmates, go through a detention officer's pocket, and take all the keys, including car keys, so they could leave the facility. Moss said the plan was "pretty sophisticated" and she believed appellant was the ringleader. Five days later, appellant and another inmate tried to implement the plan, which involved attacking a detention officer while appellant took his keys. Greenville police were called and had to restrain appellant, who was belligerent, cussing, taunting to get tazed, and threatening to kill the detention officers.

The day after the escape attempt, appellant was on "protective confinement" because he was considered a "flight risk." He left his room while staff was bringing his food and refused to return. A probation officer had to be called to assist in getting appellant back to his room.

Moss said appellant "is really a good kid," but when he does not "get his way," he becomes belligerent, out of control, violent, and aggressive to other inmates and staff. She agreed some of his behavior is "somewhat disrespectful" and a sign of immaturity. Appellant was put on medication, though Moss did not know the specifics. He still "gets upset" but is not "acting out as much as he was."

The final State's witness was Kaufman County Probation Officer Gene Gardner, who was assigned to appellant's case after his arrest and testified to appellant's extensive criminal history. He said a complete diagnostic study and social evaluation was performed on appellant and filed with the court.

According to Gardner, beginning at age 11, appellant had been arrested five times for resisting arrest, assault, unlawfully carrying a weapon, a gun, robbery and theft and was on probation at the time of this offense. Appellant received juvenile services through thirteen or fourteen different residential and nonresidential programs including family therapy, electronic monitoring, substance abuse treatment, intensive supervision, and detention alternative daily reporting. Appellant's problems stemmed primarily from his relationship with his mother.

While appellant was in custody for this offense, he was charged with assaulting the 12-year-old inmate, attempted escape from custody, and assault on a public servant. Like Moss, Gardner said appellant was the mastermind behind the escape plot and considered appellant's conduct sophisticated. He said he recommended appellant be transferred to criminal district court based on his prior history and record, and his behavior in detention bolstered that recommendation. In making a determination on sophistication and maturity, he said he looked at appellant's behavior, his arrest history, the type of offense committed, drug use, his compliance with probation conditions, and his compliance with parental rules. Gardner believed appellant's level of sophistication is slightly high for his age, based primarily on his association with older people, and his maturity level is age-appropriate.

Gardner also said he reviewed the psychological evaluation of Dr. John Kennedy, who believed appellant would be able to function in the adult system and recommended appellant be transferred. When asked his opinion on the prospects of protecting the public and the likelihood of rehabilitating appellant by using the procedures, services, and facilities available in the juvenile system, Gardner said it was "remote." He explained appellant had been on probation for two years before this offense, continued to violate the law, and then picked up three new criminal offenses while in detention. He said the only option would be to commit him to a state juvenile facility, but he did not "see anything changing." If placed in a state juvenile facility, appellant

could be a potential threat to other juveniles and was, in fact, a threat at the Hunt County facility as evidenced by his attack on the younger boy. Gardner had not "seen any indication that his behavior is going to change" and, in fact, has "gotten worse" as he gets older.

Appellant's first witness was Chris Ambers, his juvenile probation officer at the Dallas County Youth Village from December 2014 to June 2015–five months before this offense was committed. Ambers said the facility works to help youth make better decisions and be productive law-abiding citizens. During appellant's stay, Ambers said he was quiet, followed the rules, and did not present major problems. Appellant was "more of a follower" who was "easily influenced." When asked if he believed appellant's thought processes lacked sophistication, Amber said he could not "determine that" at the present time, but felt he lacked sophistication while in the Youth Village. Ambers acknowledged if appellant continued to commit crimes after his release from the facility, then the behavior modification program was not successful.

Sharon Jackson, the principal at appellant's middle school, told the court when she arrived at the school in August 2015, appellant was identified as one of the "particularly challenging" students. Once she got to know him, she "really didn't understand the basis of it." Appellant was two grades behind, having been held back in the sixth and seventh grades; to help him be successful, she had him "check in" with her regularly to let her know how things were going. He was below-average academically but had average intelligence if he exercised self-discipline. He was socially "average," and a "follower" as opposed to leader, although she said appellant believed himself to be a leader. Jackson felt appellant was emotionally immature and knows what he is doing is unacceptable but is not mature enough to understand the consequences. For example, she said she required students to apologize when they did something immature, and appellant "would have a difficult time" apologizing. Appellant was capable of being manipulated because he cares about what his peers think of him "or he has to be

the man on campus." At the same time, Jackson said appellant had "a lot of street sense" and was known in his neighborhood as "a man who can fight, the one who disrespects adults." She had seen him at the park hanging out with a group of older guys, and other students feared him.

Finally, appellant's aunt, Danuel Smith, said she has always been a part of appellant's life. She said he lives with his grandmother in a home with too many people in an economically depressed, crime-ridden neighborhood. She said his father is deceased, and he has a "somewhat unbalanced" relationship with his mother. On a typical day, she said appellant would go to school and then hang out at the park with much older guys. She said he pretends to be something he is not in his neighborhood and was susceptible to peer pressure. Smith believed appellant's level of sophistication was below average, but her observations were directed more at the fact her children functioned at a higher educational level than he did. She did not know until the hearing that he had been treated for depression. Smith said appellant was the "product of a failed environment" but could be successful with consistency and stability.

In addition to the witnesses' testimony, the trial court also admitted the psychological evaluation prepared by Dr. Kennedy, who concluded appellant's level of maturity and sophistication and his past history indicate he is capable of functioning in the adult criminal justice system. Based on the seriousness of the alleged offense and appellant's ability to understand the charges at a "mature level," Kennedy concluded appellant met the "minimum standards" necessary to be transferred to criminal district court. In addition to Kennedy's evaluation, the court had the written social evaluation and investigative report and addendum prepared by the Kaufman County Juvenile Department. After considering the testimony and the various documents, the trial court granted the petition to waive jurisdiction and transfer appellant's case to the criminal district court. This appeal followed.

Because children 10 years of age or older and under 17 years of age are not subject to prosecution in adult court for criminal offenses, the juvenile court has exclusive original jurisdiction over cases involving what would otherwise be criminal conduct. *See* TEX. FAM. CODE ANN. §§ 51.02(2), 51.03(a)(1), 51.04(a) (West Supp. 2015). But if a juvenile court determines after a full investigation and hearing that certain conditions are met, it may waive jurisdiction and transfer a child to the district court for criminal proceedings. *See id.* § 54.02(a), (c) (West 2014); *Matter of S.G.R.*, No. 01-16-00015-CV, 2016 WL 3223675, at *1 (Tex. App.—Houston [1st Dist.] June 9, 2016, no pet.). The State initiates this process by filing a petition and meeting the notice requirements. *See* TEX. FAM. CODE ANN. § 54.02(b).

At the transfer hearing, the State bears the burden of proving, by a preponderance of the evidence, that waiver of the juvenile court's jurisdiction is appropriate. *Moon v. State*, 451 S.W.3d 28, 40–41 (Tex. Crim. App. 2014). The hearing is not a trial on the merits, and the court does not consider guilt or innocence; rather, it considers only whether the juvenile's and society's best interests would be served by maintaining custody of the child in the juvenile system or by a transfer to a district court for trial as an adult. *Lopez v. State*, 196 S.W.3d 872, 874 (Tex. App.—Dallas 2006, pet. ref'd).

To transfer a child who is alleged to have committed a capital felony to the criminal district court, a juvenile court must first find (1) the child was 14 years of age or older at the time of the alleged offense, (2) probable cause exists to believe the child committed the alleged offense and (3) because of the seriousness of the offense or the background of the child, the welfare of the community requires criminal rather than juvenile proceedings. TEX. FAM. CODE ANN. § 54.02(a); *Lopez*, 196 S.W.3d at 874.

When determining whether there is a preponderance of the evidence to satisfy the third requirement, the juvenile court shall consider, among other matters: (1) whether the offense was

against person or property, with greater weight in favor of transfer given to offenses against the person; (2) the sophistication and maturity of the child; (3) the record and previous history of the child; and (4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court. *See* TEX. FAM. CODE ANN. § 54.02 (f); *Lopez,* 196 S.W.3d at 874. All four of these factors need not weigh in favor of transfer for the juvenile court to waive its jurisdiction; any combination may suffice. *Moon*, 451 S.W.3d at 47 & n.78.

On appeal, in evaluating a juvenile court's decision to waive jurisdiction, we first review the juvenile court's specific findings of fact regarding the section 54.02(f) factors under "traditional sufficiency of evidence review." *Moon*, 451 S.W.3d at 47. But, we review the juvenile court's ultimate waiver decision under an abuse of discretion standard. *Id.* As the court of criminal appeals has explained:

> . . . in deciding whether the juvenile court erred to conclude that the seriousness of the offense alleged and/or the background of the juvenile called for criminal proceedings for the welfare of the community, the appellate court should simply ask, in light of its own analysis of the sufficiency of the evidence to support the Section 54.02(f) factors and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or principles. In other words, was its transfer decision essentially arbitrary, given the evidence upon which it was based, or did it represent a reasonably principled application of the legislative criteria?

*Id.*

In his first issue, appellant contends he was improperly certified because "there was no probable cause to believe" he committed the offense. Probable cause exists where there are sufficient facts and circumstances to warrant a prudent person to believe the suspect committed the offense. *Matter of B.C.B.*, No. 05-16-00207-CV, 2016 WL 3165595, at 3 (Tex. App.—Dallas June 7, 2016, pet. filed).

Appellant challenges probable cause because Frierson conceded no evidence shows appellant exited the car at the scene or had a "leadership" role in the incident. Consequently, appellant asserts the State had to prove he was a party to the offense, but the evidence shows only that he was "merely at the scene," which is "insufficient to prove legal responsibility for the offense." Appellant's argument is contradicted by the record.

Frierson connected the car parked outside the house on the morning of the murder to the car appellant was in at Buc-ees only fifteen minutes earlier. Frierson's testimony established appellant was inside the car when Kimbel said he wanted to "hit a lick." And appellant admitted that at some point, he knew Kimbel had a gun, which appellant described as a .38 Special. Although appellant claimed he was sleeping the whole time, one of the other suspects said everyone was awake in the car. More importantly, Frierson said the video indicates appellant was driving the car when the group left Buc-ees for Forney, supporting a conclusion that appellant aided in the commission of the offense by driving to the scene after Kimbel said he wanted to "hit a lick."

To the extent appellant challenges Frierson's testimony that he was driving the car once it left Buc-ees, Frierson explained in detail why he thought the video showed appellant getting into the driver's seat. Finally, appellant emphasizes the fifteen-minute gap between when the car left Buc-ees and arrived at the house in Forney, suggesting someone else could have gotten behind the wheel. But, as Frierson explained, it was raining that morning and seemed unlikely someone would "stop in the rain to switch drivers." Having reviewed the evidence, we conclude the juvenile court acted within its discretion in finding probable cause. We overrule the first issue.

In his second issue, appellant contends he was improperly certified as insufficient evidence supports the section 54.02(f) factors. We review section 54.02(f) factors for

"traditional" sufficiency but then review the ultimate waiver decision for an abuse of discretion. *Moon*, 451 S.W.3d at 47.

The trial court's order contained the following specific findings under section 54.02(f):

1. The offense alleged to have been committed was against the person of another.

2. The sophistication and maturity of the Respondent are sufficient to transfer the child to the appropriate district court for criminal proceedings.

3. The record and previous history of the Respondent indicate a higher degree of supervision is indicated and that transfer to the appropriate district court is required.

4. The prospects of adequate protection of the public and the likelihood of the rehabilitation of the Respondent by use of the procedures, services, and facilities currently available to this Court are remote.

When reviewing the legal sufficiency of the evidence, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable factfinder could not reject the evidence. *Matter of B.C.B.*, 2016 WL 3165595, at *3. If there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Faist v. State*, 105 S.W.3d 8, 12 (Tex. App.—Tyler 2003, no pet.). Under a factual sufficiency review, we consider all the evidence presented to determine if the court's finding is so against the great weight and preponderance of the evidence as to be clearly wrong or unjust. *Id.*

Beginning with the first factor, appellant agrees the offense alleged to have been committed was against a person. With respect to the second factor, appellant asserts insufficient evidence establishes he has the sophistication and maturity appropriate for transfer. Here, he relies on the testimony of Jackson, Smith, and Ambers to show he lacked sophistication and maturity. Ambers did not give an opinion on appellant's level of sophistication and maturity at the time of the hearing; he testified only that appellant lacked sophistication while in his facility months earlier. To the extent Jackson and Smith testified as such, the juvenile court had other evidence establishing the contrary. Moss testified at length about appellant's attempt to escape

–11–

during his four months under her supervision and the sophistication of the plan he hatched. Likewise, Gardner believed appellant's conduct in planning the escape was sophisticated. He believed, after reviewing all the information, that appellant's sophistication level for his age was elevated and his maturity level was "age appropriate." Although appellant asserts no evidence shows he developed the escape plan, the record belies his claim. The juvenile court could have reasonably inferred appellant concocted the plan because detailed written notes were found in his possession. A witness identified appellant as the "master mind behind the escape." Having reviewed the record, we conclude the evidence was legally and factually sufficient to support the trial court's finding that appellant's sophistication and maturity justified transfer.

The third factor is the record and previous history of the child. Here, appellant acknowledges he has a criminal history but asserts it is "non-violent." He argues that when in an environment with access to his medications, his criminal activities decreased.

Gardner testified at length about appellant's criminal history and we disagree with appellant's assertion that it is non-violent. Prior to this offense, from September 2011 to October 2014, appellant had many run-ins with the law: age 11, resisting arrest; age 13, assault; age 13, unlawfully carrying a weapon; age 14, robbery; and age 14, theft from a person. As a result, he had been ordered to attend many non-residential programs and had previously been placed at the Dallas County Youth Village. While in the juvenile system, officials tried family therapy, electronic monitoring, substance abuse treatment, intensive supervision, and detention alternative daily reporting, all without any apparent lasting effect. At the time of this offense, he was on probation for theft from a person. Then, after his arrest, he was placed in the Hunt County juvenile facility, where he picked up additional charges related to an assault of a younger, smaller boy, attempted escape, and assault on a public servant. Finally, both Gardner and Dr. Kennedy believed transfer was appropriate. Considering the evidence, we conclude it is legally

–12–

and factually sufficient to support the juvenile court's finding that appellant's record and previous history indicate a "higher degree of supervision" is required.

The last factor is "the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court." Here, appellant relies on testimony from Ambers that appellant did well in his program, followed the rules, and presented no problems. He argues Ambers was the "most informed person" to provide an assessment and directs us to his testimony that if a juvenile has the history that appellant does and had been through other programs, he would look to the "most least restrictive" well-structured environment possible. However, Ambers also acknowledged some situations merit transfer to the adult system. And, as stated previously, while appellant had established an extensive criminal history, his efforts at rehabilitation were littered with failure. Legally and factually sufficient evidence support the court's finding that the prospects of protecting the public and rehabilitating appellant through the juvenile system are remote.

The juvenile court addressed each of the factors set out in section 54.02(f) in deciding to waive its jurisdiction and transfer appellant to criminal court. Having reviewed the record, we conclude the juvenile court made a "reasonably principled application of the legislative criteria" in determining the statutory factors all weighed in favor of transfer and that transfer in this case is appropriate due to both the serious nature of the alleged offense and the background of the appellant. We overrule the second issue.

We affirm the trial court's order waiving jurisdiction and transferring appellant to criminal district court.

/Molly Francis/
MOLLY FRANCIS
JUSTICE

160678F.P05

–13–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE MATTER OF R.D.G., JR., A
JUVENILE

No. 05-16-00678-CV

On Appeal from the County Court At Law,
Kaufman County, Texas
Trial Court Cause No. 16J-009.
Opinion delivered by Justice Francis;
Justices Fillmore and Schenck participating.

In accordance with this Court's opinion of this date, the juvenile court's Waiver of Jurisdiction and Order of Discretionary Transfer of Child to Criminal Court is **AFFIRMED**.

Judgment entered September 12, 2016.